Christopher M. Burke (CA 214799)
Walter W. Noss (CA 277580)
Hal D. Cunningham (CA 243048)
John T. Jasnoch (CA 281605)
Jennifer J. Scott (CA 279988)
Kate Lv (CA 302704)
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RACHEL L. MILLER, on Behalf of Herself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>QUALCOMM INCORPORATED, a Delaware Corporation,<br><br>Defendant. | Case No. **'17CV147 LAB WVG**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAWS, STATE UNFAIR COMPETITION LAWS, AND UNJUST ENRICHMENT**<br><br>**(Jury Trial Demanded)** |

Plaintiff, by and through her undersigned attorneys, brings this class action and alleges as follows:

## I.    INTRODUCTION

1.    Plaintiff is a purchaser of a cellular telephone.  In such devices (and in other devices such as computer tablets), there is a modem chipset (also called a baseband processor), which allows the device to communicate and transmit voice and data across wireless networks controlled by carriers, such as Verizon or Sprint.  Plaintiff brings this action against Defendant Qualcomm Incorporated ("Qualcomm") for its anticompetitive conduct in acquiring and maintaining its monopoly over the modem chipset market and abusing the intellectual property rights underlying this technology and charging an excessive and unlawful royalty on cellular phones or devices incorporating such patents, with the result that each end-user purchaser of such phones or device pays an inflated price.

2.    To communicate with an operator's network, a cellular device must contain a modem chipset that complies with cellular communications standards that the network supports.  Standard setting organizations ("SSOs"), comprised of device and device component developers as well as others, collaborate to set technology requirements to ensure mass interoperability among all system components.    Because a standard requires that devices utilize a specific technology, standard-compliant devices will, in some cases, infringe on certain patents for technology incorporated in the standard.  Such patents are called standard essential patents ("SEPs").  SEP holders benefit by obtaining licensing fees and royalties associated with use of their technology.  Given the power such standards may give SEP holders, before selecting a standard, SSOs consider various alternative technologies, and importantly, also require that the developers of these standards agree to license their technology on fair, reasonable, and nondiscriminatory ("FRAND") terms.  This ensures that competitors may use the technology rather than being excluded from the market,

1

and device manufacturers may use the technology without being subjected to unreasonable terms.

3.    Qualcomm was one of the earliest developers of cellular technology, developing the technology underlying the Code Division Multiple Access ("CDMA") standard on which network carriers such as Verizon and Sprint relied.  It is the dominant producer of CDMA chipsets and holds the largest number of SEPs for CDMA technology.  Having agreed to license its technology on FRAND terms, Qualcomm's technology has been incorporated into virtually every relevant cellular standard in the last several years.

4.    Qualcomm has not adhered to its FRAND promises, but has instead taken advantage of the standard-setting process to acquire and maintain monopoly control of the modem chipset market.  Beginning at least as early as 2008, Qualcomm, among other things, (1) refused to license, or alternatively imposed onerous restrictions on licenses of, its SEPs to competing chipset makers; (2) conditioned the supply of its CDMA chipsets on agreeing to Qualcomm's license agreements for its entire patent portfolio; (3) entered into exclusive deals with certain cellular phone manufacturers, such as Apple, Inc. ("Apple"); and (4) most onerously, ignored the requirements of SSOs to license its SEPs on FRAND terms to patent users to extract unreasonably high, unilaterally determined royalty payments.

5.    Plaintiff and the classes of persons she seeks to represent have been harmed by paying supracompetitive prices for the telephones they purchased. Qualcomm has now "parlayed its pioneering role in cellular technology into a patent-licensing business that generates most of its profits.  Qualcomm charges a royalty on nearly every smartphone made, whether or not the device uses its chips."[1]  Qualcomm admits in its Form 10-Q filed on June 29, 2016 with the

---

[1]    Don Clark, *Qualcomm's Main Profit Driver Is Under Pressure*, THE WALL STREET JOURNAL (Apr. 13, 2015).

CLASS ACTION COMPLAINT

Securities and Exchange Commission ("SEC") that "[r]oyalties are generally based upon a ***percentage of the wholesale (i.e., licensee's) selling price of complete licensed products***, net of certain permissible deductions (including transportation, insurance, packing costs and other items)." (Emphases added.) It typically charges makers of 3G devices − and 3G-compatible 4G models − up to 5% of their products' wholesale price − around $20 on a $400 phone.

6.    Qualcomm's anticompetitive conduct has been met with condemnation by regulators around the world. On September 9, 2009, the Japanese Fair Trade Commission ("JFTC") issued a cease and desist order against Qualcomm because of the violation of its FRAND obligations. On February 10, 2015, the Chinese National Development & Reform Commission ("NDRC") found that Qualcomm had abused its monopoly power and restricted competition in violation of the country's Anti-Monopoly Law, fining Qualcomm $975 million. On December 21, 2016, the Korea Fair Trade Commission ("KFTC") fined Qualcomm $854 million (the largest fine in its history) for abuse of market dominance and anticompetitive conduct with respect to its licensing practices.

7.    Most recently, on January 17, 2017, the United States Federal Trade Commission ("FTC") filed an enforcement action against Qualcomm in the U.S. District Court for the Northern District of California, challenging Qualcomm's unlawful maintenance of a monopoly in baseband processors, alleging Qualcomm has excluded competitors and harmed competition, resulting in the increased prices paid by consumers for cell phones and tablets. *Federal Trade Commission v. Qualcomm Inc.*, Case No. 17-cv-00220 (N.D. Cal. Jan. 17, 2017).

8.    Plaintiff brings this action on behalf of herself and others similarly situated to recover for their injuries resulting from Qualcomm's violations of Section 2 of the Sherman Act, as well as violations of California state antitrust

and consumer protection laws.  Plaintiff seeks monetary damages, injunctive relief, and any other available remedies to which she and others similarly situated are entitled for Qualcomm's unlawful conduct.

## II.    PARTIES

### A. Plaintiff

9.    Plaintiff Rachel L. Miller ("Miller") is a resident of Carlsbad, California.  Miller purchased an Apple iPhone 5 for personal use and not for resale during the Class Period.

### B. Defendant

10.    Defendant Qualcomm is a Delaware corporation having its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.  Qualcomm develops, designs, licenses, and markets worldwide its digital communications products and services, primarily through its two main business segments: Qualcomm CDMA Technologies ("QCT") and Qualcomm Technology Licensing ("QTL").  QCT deals with equipment sales while QTL engages in licensing of patents and technology.  QCT, a wholly owned subsidiary of Qualcomm, is operated by Qualcomm Technologies, Inc. ("QTI"), another wholly owned subsidiary of Qualcomm.  QTL, a third wholly owned subsidiary of Qualcomm, grants licenses or otherwise provides rights to use portions of Qualcomm's patent portfolio.

## III.    JURISDICTION AND VENUE

11.    This action arises under Sections 4 and Section 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26, for Defendant's violations of Section 2 of the Sherman Act, 15 U.S.C. §2, and Section Three of the Clayton Act, 15 U.S.C. §14.  The Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §§1331 and 1337.

12.    Plaintiff also brings claims under California state law as set forth herein.  The Court has jurisdiction over these state law claims under 28 U.S.C. §§1332(d) and 1367.

13.    Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. §1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and Qualcomm transacts business and maintains facilities in this District and thus is subject to personal jurisdiction here.  Qualcomm is engaged in interstate commerce, and its activities, including those activities that form the basis of this Complaint, substantially impact interstate commerce.

14.    Millions of cellular devices were purchased at artificially inflated rates in this District in recent years.

## IV.    FACTUAL BACKGROUND

### A. SSOs, SEPs, and FRAND Obligations

15.    Interoperability and compatibility are critical for modern electronic devices.  Although users may take for granted that their cellular devices will be able to connect wirelessly to their cellular network and the Internet, interoperability does not happen by chance.  Each component of a cellular network (such as those operated by AT&T, Verizon, and Sprint), and, by extension, each component of mobile wireless devices utilizing that cellular network, must work with other components, regardless of which company made each component.

16.    "Mobile wireless telephony" is the general term for describing the technology and equipment used in the operation of cellular telephones.  A cellular telephone contains a "modem chipset" (also called a baseband processor) – the core electronic unit that allows it to transmit and receive information (either telephone calls or data) to and from the wireless network. Specifically, these chipsets transmit information, via radio waves, to cellular

base stations. Base stations, in turn, transmit information to and from telephone and computer networks. It is essential that all components involved in this transmission of information be able to communicate seamlessly with one another.

17. Because of the multitude of devices, device designers, component manufacturers, and others must agree to uniform standards to ensure the smooth operation of the cellular network and the cellular devices that connect to it. To achieve this, cellular network carriers, chipset manufacturers, cellular device manufacturers, and others have SSOs, such as the European Telecommunications Standard Institute ("ETSI"), the International Telecommunications Union ("ITU"), and the Institute of Electrical and Electronic Engineers ("IEEE").

18. SSOs create standards and technical specifications and in doing so also declare patents that might be essential to those standards. The technology incorporated into a standard is typically chosen from among different options. Once incorporated and widely adopted, that technology is not always used because it is the best or the only option; it is used because the use of that technology is necessary to comply with the agreed-upon standard. Competition within that technology market is eliminated, as competing technologies are no longer available as alternative means of implementing the standard. Additionally, to implement a technological standard, devices often need to incorporate a patented invention on which the standard is based. These are the SEPs discussed previously. Holders of patents essential to technology incorporated into a standard declare their patents as SEPs. Consequently, manufacturers of products containing the patented technology generally need to license the SEP to be compliant with the applicable standard.

19. Antitrust law recognizes that under certain circumstances, collaboration by industry participants can increase competition, innovation,

6

product quality, and consumer choice.   For example, in this context, collaboration allows consumers to have confidence that cellular devices bought from different manufacturers will operate with each other and with the cellular network that they choose.   Similarly, common standards allow component manufacturers, carriers, and others in the industry to invest in technological advancement with confidence that their products will work with wireless networks.

20.    However, standards can pose challenges to OEMs and can involve tradeoffs for consumers.   For example, a company implementing standards in a product must use certain mandated technologies, even where many viable, and perhaps even superior, alternatives exist.   Once a standard is adopted, participants begin to make investments tied to the implementation of the standard.   Because these participants may face substantial switching costs in abandoning initial designs and substituting a different technology, an entire industry can become "locked in" to a standard.

21.    The adoption of SEPs into technological standards also enhances the potential for abuse by the patent owner.   "Patent hold-up" occurs when the holder of a SEP demands excessive royalties after companies are locked into using a standard.   Where standardized technologies are covered by patents, companies that choose to implement a standard have no choice but to license those patents (and accept the licensor's terms) or face a lawsuit if they use the technology without a license.   "Royalty stacking" arises when a standard implicates numerous patents.   These royalty payments "stack" on top of each other and, in turn, inflate the cost of the product to the consumer.   Royalty stacking can be a significant concern:

> The data show that royalty stacking is not merely a theoretical concern. Indeed, . . . we estimate potential patent royalties in excess of $120 on a hypothetical $400 smartphone − which is almost equal to the cost of [the] device's components.  Thus, the smartphone royalty stack

7

across standardized and non-standardized technology is significant, and those costs may be undermining industry profitability – and, in turn, diminishing incentives to invest and compete.[2]

22.    To help alleviate these potential concerns, before agreeing to a particular standard, SSOs seek certain assurances from patent owners. Specifically, SSOs ask SEP holders to agree to license their patents on fair, reasonable, and non-discriminatory terms, referred to as a SEP holder's FRAND obligations.  For example, the IEEE asks SEP owners to pledge that they will grant licenses to an unrestricted number of applicants on "reasonable, and nondiscriminatory" (or "RAND") terms.  If a patent holder does not choose to make this promise, the SSOs design a standard without using the patented technology.

23.    FRAND obligations are designed to, among other things, prevent SEP holders from wielding control over essential technology and restricting competition, development, and research related to the standard.  SEP holders generally agree to FRAND terms because SSOs may exclude technologies from the standard when a patent holder does not agree to FRAND terms.  SEP holders also benefit from license fees and royalties they gain from cooperating with the SSO.

24.    As the United States Court of Appeals for the Third Circuit has noted in one suit against Qualcomm:

> [A] standard, by definition, eliminates alternative technologies . . . .  When a patented technology is incorporated in a standard, adoption of the standard eliminates alternatives to the patented technology.  Although a patent confers a lawful monopoly over the claimed invention, its value is limited when alternative

---

[2]    Ann Armstrong, Joseph J. Mueller, and Timothy D. Syrett, *The Smartphone Royalty Stack: Surveying Royalty Demands for the Components Within Modern Smartphones* (May 29, 2014), https://www.wilmerhale.com /pages/publicationsandnewsdetail.aspx?NewsPubId=17179872441.

> technologies exist . . . . That value becomes significantly enhanced, however, after the patent is incorporated in a standard. Firms may become locked in to a standard requiring the use of a competitor's patented technology. The patent holder's [intellectual property rights], if unconstrained, may permit it to demand supracompetitive royalties. It is in such circumstances that measures such as FRAND commitments become important safeguards against monopoly power.

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007) (citations omitted).

25.    When a SEP holder makes a FRAND promise to an SSO, implementers of the standard at issue and their customers are third-party beneficiaries of that promise. FRAND obligations are more than a matter of a private contract between owners of technology, on the one hand, and SSOs and their other members (and implementers of the standard as intended third party beneficiaries), on the other. Instead, they are a critical precondition for antitrust tolerance of the industry collaboration on which standard-setting depends.

**B. The Cellular Industry and Qualcomm's Dominance and Abuse of Power**

26.    Wireless standards have evolved in distinct generations, as consumers demanded more features and the industry responded by developing new innovations. The following graphic, created by Qualcomm, shows the evolution of this technology:[3]

---

[3]    Qualcomm, *The Evolution of Mobile Technologies: 1G-2G-3G-4G-LTE*, (June 2014), https://www.qualcomm.com/media/documents/files/the-evolution-of-mobile-technologies-1g-to-2g-to-3g-to-4g-lte.pdf.



27. For purposes of this case, following the first generation of cellular technology, the cellular industry developed second generation ("2G") cellular technology, from which two primary technology paths, or families of standards, emerged: (1) "CDMA," which stands for "Code Division Multiple Access"; and (2) "GSM," which stands for "Global System for Mobility." CDMA is a channel access method used by various radio communication technologies. It provides multiple access, where several transmitters can send information simultaneously over a single communication channel. CDMA is used as the access method in many mobile phone standards. GSM is another digital mobile telephony system that is widely used in Europe and much of Asia, other than Japan and South Korea. It utilizes a variation of time division multiple access. Cellular telephone service providers operated under one or the other path, with, for example, Verizon and Sprint operating CDMA-path networks, and AT&T (formerly Cingular) and T-Mobile operating GSM-path networks. The CDMA and GSM technology paths are not interoperable; in other words, equipment and technologies designed to be compatible with one standard cannot be used for the other standard.

28. Mobile devices are configured for a particular carrier, like AT&T or Verizon, and thus chipsets designed for a particular wireless device must conform to the standard technology chosen for the carrier's associated network. In other words, CDMA-based networks demand chipsets that conform to the CDMA standard, and GSM networks require chipsets that conform to the GSM

10

standard.  As a result, chipsets that comply with a given standard are not substitutes for chipsets that comply with other standards.  These chipsets likewise have different price and demand characteristics.  Downstream consumers purchase cell phones that include chipsets configured to operate using the standards chosen for a particular network, and once purchased, those consumers are inextricably tied to that standard for use of that device.

29.    Qualcomm pioneered the development of CDMA technology.  As a result, it controlled, and continues to control, the market for such technology, initially selling 90% of the chipsets that go into CDMA-compatible phones and continuing to control over 80% of the market.  Additionally, Qualcomm amassed many patents related to this standard.  Consequently, virtually any company that makes CDMA products − be they chipsets, phones, or infrastructure gear − has to obtain a license from Qualcomm.  Licensees pay a one-time fee for access to the patent portfolio and then royalties based on the final product sold by the licensee (*e.g.*, a smartphone).  Nearly all wireless companies have signed patent licenses with Qualcomm.

30.    Qualcomm's royalty stream has continued in the technologies standardized in third generation ("3G") cellular technology.  As with the prior generation of cellular technology, 3G evolved into two competing standards − but this time, ***both*** major standards were based on CDMA.  While an improved version of CDMA technology was developed, the "Universal Mobile Telecommunications Service" ("UMTS") standard was also developed.  UTMS uses radio technology called WCDMA, which stands for "Wideband Code Division Multiple Access."  WCDMA technology allows for even further increased data speed and capacity.

31.    The UMTS standard was adopted by the ITU, ETSI, IEEE, and other SSOs in the United States and elsewhere after evaluating alternative available equipment and technologies.  Qualcomm supplies some of the

11

essential technology that the ETSI included in the UMTS standard and holds intellectual property rights ("IPRs"), such as patents, in this technology. Among others, Qualcomm owns the essential patents for the WCDMA standard.

32. CDMA-based technology has been adopted for *all* 3G wireless telephony and broadband standards throughout the world. As a result, Qualcomm has reaped more than $50 billion in licensing revenues since 2000. Indeed, Qualcomm charges a royalty on nearly every smartphone made, whether or not the device uses its chips.

33. ETSI and other SSOs required a commitment from vendors whose technologies are included in the CDMA and other CDMA-based standards to license their technologies on FRAND terms. Qualcomm voluntarily and publicly agreed to accept FRAND obligations.

34. Indeed, in 2008, Qualcomm noted that it "has had a long standing policy of broadly offering to license its standards essential patents for CDMA-based telecommunications standards on terms and conditions that are fair, reasonable, and free from unfair discrimination (FRAND), subject to reciprocity."[4] But in that same press release, Qualcomm publicly stated that "FRAND embodies a flexible approach that allows individual licensors and licensees to negotiate the terms and conditions that are best suited to address their respective commercial objectives" and "FRAND does not, and never has, prescribed formulas for imposing cumulative royalty caps or proportional allocations of such royalty caps." By the time it released that statement in 2008, Qualcomm had licensed its patent portfolios to more than 155 companies. making that portfolio the most widely licensed in the industry. This public statement was false. As regulatory actions in multiple countries have confirmed, Qualcomm has not abided by FRAND principles and its interpretation of

---

[4] Qualcomm, *LTE/WiMax PATENT LICENSING STATEMENT* (Dec. 2008), https://www.qualcomm.com/documents/ltewimax-patent-licensing-statement.

FRAND is not consistent with the obligations imposed on it by SSOs. Qualcomm's promises to comply with its FRAND obligations induced the SSOs to adopt its technology in the cellular technology standards relevant to this action. That conduct constituted deceit and fraud on the SSOs and has injured Plaintiff and others who have paid unreasonably high prices for cellular devices as a result of Qualcomm's royalty demands.

35.     Qualcomm has abused its power over SEPs and the chipset supply to increase its own dominance in these markets and charge exorbitant royalties. Simply put, it has abused its involvement in the SSOs, which set standards around Qualcomm technology and gave it the means to be as powerful as it has become. Qualcomm's manipulation of this unique position is confirmed by multiple investigations of its conduct by trade and competition agencies around the world, as discussed below.

36.     The fourth generation of cellular technology ("4G") brought with it the "LTE" standard, which stands for Long Term Evolution of UMTS. Nearly all cellular-enabled devices sold today support LTE for 4G service. LTE is an "orthogonal frequency division multiple access" or "OFDMA"-based technology. The LTE standard does not implement CDMA-based technologies.

37.     But like the UMTS technology before it, the arrival of LTE has not significantly impacted Qualcomm's control over the chipset market or the power of its licensing business. Qualcomm holds a leading and valuable patent portfolio that applies to LTE technologies, including OFDMA, and over 90 companies (including LG, Nokia, and Samsung) have royalty-bearing licenses under Qualcomm's patent portfolio for use in OFDMA products (which do not implement any CDMA-based standards). Additionally, many of the 4G-based cellular devices still implement CDMA technology to be backwards-compatible with CDMA-based technologies that are still in use today. Qualcomm

CLASS ACTION COMPLAINT

exclusively supplies multimode CDMA-LTE chipsets that are backward compatible with CDMA.

38.    Consequently, with its power over CMDA technology, Qualcomm can and does use this as leverage to gain a greater share of the LTE-chipset market.    The following chart, prepared by the KFTC,[5] demonstrates how Qualcomm has used control over CDMA-based technologies to acquire more power and control over the LTE chipset market.

**\<Qualcomm's Market Share Trend in Modem Chipset Market per Standard (Based on Revenues)\>**

|       | Yr 2008 | Yr 2009 | Yr 2010 | Yr 2011 | Yr 2012 | Yr 2013 | Yr 2014 | Yr 2015 |
|-------|---------|---------|---------|---------|---------|---------|---------|---------|
| LTE   | -       | -       | 34.2%   | 58.8%   | 94.5%   | 96.0%   | 84.8%   | 69.4%   |
| CDMA  | 98.4%   | 97.6%   | 96.4%   | 94.3%   | 92.4%   | 93.1%   | 91.6%   | 83.1%   |
| WCDMA | 38.8%   | 47.4%   | 45.7%   | 55.0%   | 50.4%   | 53.9%   | 48.8%   | 32.3%   |

* Source: Strategy Analytics

39.    In sum, Qualcomm holds a dominant position in the supply of chipsets that support CDMA, on which devices sold by Verizon and Sprint continue to depend.    It also holds a dominant position over the LTE-chipset supply.    Qualcomm has had at least a share of 80% or more of CDMA chipsets for many years, and Qualcomm's share of LTE chipsets sold was above 90% between 2012 and 2014, and remains above 60% today.    Qualcomm has leveraged its monopoly power over the supply of these chipsets to force device manufacturers into anticompetitive license agreements.    In other words, because these companies need CDMA- and LTE-based chipsets (controlled by Qualcomm) to be able to operate with CDMA- and LTE-based networks, device manufactures have to accept unreasonable license terms as dictated by Qualcomm.    As one commentator noted: "Qualcomm's status as both a chipset

---

[5]    Qualcomm has provided an unofficial translation of the KFTC's press release on its website.    *See* KFTC-Issued Press Release dated December 28, 2016 – Unofficial English Translation, https://www.qualcomm.com/documents/kftc-issued-press-release-dated-december28-2016-unofficial-english-translation.

and IP vendor provides them with unparalleled leverage to collect licensing fees at a lower cost, simply by denying physical delivery of the chipsets until all fees are paid."[6]

40.    Qualcomm also holds a dominant position in the SEP licensing market for its intellectual property relating to modem chipsets.  Qualcomm has declared thousands of patents as essential to CDMA, UMTS (WCDMA), and LTE standards.  Consequently, OEMs are highly reliant on Qualcomm's SEP portfolio, because each CDMA-, UMTS-, and/or LTE-related SEP is indispensable and irreplaceable for such manufacturers.  Qualcomm thus controls the licensing market for SEPs for CDMA, UMTS (WCDMA), and LTE technologies because manufacturers could not produce 3G and 4G devices without risking Qualcomm's initiating patent infringement lawsuits or seeking injunctions.  Qualcomm uses its SEPs to require OEMs and others to license its entire patent portfolio, which includes non-SEPs as well.  Non-SEPs refer to the patents that are either not essential to the realization of the standard or replaceable in their functionalities through design-around or avoidance design. There is no requirement that non-SEPs be licensed on FRAND terms.  By putting both SEPs and non-SEPs into one license, Qualcomm avoids its obligation to set license terms on a FRAND basis.  In doing so, Qualcomm can charge excessive and unfairly high royalties to any licensees that were forced to accept the packaged patent licenses.

41.    Qualcomm's licensing division brings in the vast majority of its profits, as illustrated in the graph below.  As such, it is critical for Qualcomm to maintain its licensing and related terms which have made it so profitable.

---

[6]    Richard A. Taddonio, *Long – Qualcomm (NASDAQ: QCOM) - $68.42,* Columbia Business School 2015, https://www8.gsb.columbia.edu/ valueinvesting/sites/valueinvesting/ files/Taddonio_Richard-QCOM_0.pdf.



**Patent Power**
Qualcomm's pretax profit from patent royalties and chip sales

Source: the company
THE WALL STREET JOURNAL.

42.    Qualcomm has structured its business to maintain that licensing power.  In 2007, Qualcomm claimed publicly that any manufacturers using CDMA and UMTS/WCDMA technology "ha[s] to take out a license from Qualcomm" and that Qualcomm had been "pretty consistent in that model."[7]

43.    Again in 2007, Qualcomm filed an *amicus* brief to the United States Supreme Court in which it described its licensing business model as follows:[8]

> Qualcomm has provided chipmakers nontransferable, worldwide, nonexclusive, restricted licenses to its portfolio of technically necessary patents through licensing agreements called ASIC [Application Specific Integrated Circuits] Patent License Agreements ("APLAs"). Chipmaker-licensees typically pay Qualcomm an up-front license fee and a running royalty (paid quarterly) that is an agreed upon percentage of the defined Net Selling Price of the chips produced by the licensee . . . . An APLA provides the chipmaker-licensee with a license to ***make*** (or have made) its own ASICs.  An APLA also provides the chipmaker-licensee with a restricted license to ***sell*** ASICs,

---

[7]    Qualcomm, Inc. at Jefferies Technology Conference (Oct. 2, 2007), at 5.

[8]    *Quanta Computer, Inc. v. LG Elecs, Inc.*, No. 06-937, 2007 WL 4340879 (U.S. Dec. 10, 2007), at *7-*9.

CLASS ACTION COMPLAINT

but only to handset makers that the APLA defines to be an "Authorized Purchaser" for incorporation into fully assembled handsets. Authorized Purchasers are those handset makers that themselves have a license from Qualcomm through their own Subscriber Unit License Agreement ("SULA") to make, use and sell fully assembled handsets that, in the absence of a SULA, would infringe Qualcomm's patents. Importantly, by their express terms, APLAs do ***not*** grant a license to the chipmaker to ***use*** the ASICs − i.e., licensed chipmakers may not themselves use or pass on to others the right to use the chipmaker's ASICs to make, operate or sell handsets or any other product. APLAs explicitly state that the rights to use the ASICs to make, operate or sell handsets are only conferred by licensing agreements between Qualcomm and Authorized Purchasers (i.e., by SULAs). APLAs also expressly state that the license granted is only for the limited scope laid out, that no other license is granted or implied and that if the chipmaker-licensee sells ASICs to entities that are not Authorized Purchasers, the licensee has materially breached the APLA, which gives Qualcomm the right to terminate the agreement, including the license granted.

As previously mentioned, producers of chips that are licensed through APLAs are granted, *inter alia*, a license to sell such chips only to handset makers that have entered into a SULA with Qualcomm. The standard terms of the SULAs have granted handset makers a nontransferable, worldwide, nonexclusive, unrestricted license to Qualcomm's patents to ***make*** (and have made), import and ***use*** handsets, and to ***sell*** (and offer to sell) completed handsets. SULAs typically provide for an up-front licensing fee to be paid to Qualcomm, along with a running royalty (paid quarterly) that is set as a percentage of the Net Selling Price of the handsets sold.

(Emphasis in original.)

CLASS ACTION COMPLAINT

44.     Even where Qualcomm sells its own chips, it requires purchasers to agree to its license agreements − which include the royalty rate based on the selling price of the device.  As Qualcomm explained in its amicus brief:

> Qualcomm is also in the business of developing and selling its own chips and software for wireless handsets. Qualcomm typically sells chips only to those handset manufacturers that are licensed to Qualcomm's patents under a SULA.   Such chip sales are pursuant to Components Supply Agreements, in which handset makers agree to pay Qualcomm an agreed upon price for the chips sold by Qualcomm.

> Components Supply Agreements provide that the buyer-handset makers may only incorporate the chips purchased from Qualcomm into fully assembled handsets that are the subject of the SULA.

Essentially, cellular devices today are unable to connect to their network without paying a royalty (between 3%-5% of the price of the entire device) to Qualcomm.[9]

45.     In short, the KFTC correctly identified three abusive and anticompetitive practices by Qualcomm.  *First*, it did not provide SEP licenses to competing chipset companies while threatening to sue them under those patents if they compete against Qualcomm in the sale of chipsets.  *Second*, in selling baseband processors to OEMs like cellular phone makers, Qualcomm demanded the execution and performance of its license agreements, thus leveraging its SEPs improperly.  And as a result, *third*, QTL coerced cellular phone makers to accept unilateral onerous terms.

46.     The KFTC depicted this conduct in the graphic below:[10]

---

[9]     *See also* Subscriber Unit License Agreement, SEC.gov, https://www.sec.gov/Archives/edgar/data/1092492/000119312504140764/dex103.htm.

[10]    *See supra* note 5.

47.    Qualcomm's policy of not licensing SEPs to competing chipset makers while insisting on licensing from cellular device manufacturers has entrenched its market power.

48.    Additionally, as OEMs cannot purchase chipsets from Qualcomm's competitors without also paying royalties to Qualcomm, to avoid such royalties, in some cases OEMs and other mobile device suppliers agree to deal exclusively or near-exclusively with Qualcomm on the purchase of chipsets.  As the FTC explained in its complaint, since 2007, Apple has entered into agreements to deal exclusively with Qualcomm in exchange for partial relief from Qualcomm's standard royalties.  Samsung has also entered into a similar exclusive dealing arrangement with Qualcomm.[11]

49.    Qualcomm's exclusive supply arrangement with these OEMs denies other baseband processor suppliers the benefits of working with a

---

[11]    Joel Hruska, *Qualcomm may have inked exclusive deal to put Snapdragon 820 in Samsung hardware*, ExtremeTech.com (Dec. 21, 2015) https://www.extremetech.com/mobile/219791-qualcomm-may-have-inked-exclusive-deal-to-put-snapdragon-820-in-samsung-hardware.

19

particularly important cell phone manufacturers and hampers their development into effective competitors.

50.    As the KFTC explained, the size of the modem chipset market doubled since 2008, but Qualcomm's licensing practices caused no significant competitor to enter the market, and rather, caused many existing competitors to exit it:[12]



51.    The result has been a steady increase in Qualcomm's share of the chipset market:[13]



---

[12]    *See supra* note 5.

[13]    *Id.*

52.    This dominance in the chipset market, coupled with its ownership of critical SEPs built into several of the standards adopted by various SSOs, allowed Qualcomm to impose onerous license terms on cellular device manufacturers, including exorbitant royalties that were not the result of the FRAND process.

53.    Qualcomm's royalty rates of 5% for most CDMA products and 3.25% for more recent LTE based products are significantly higher than others in the industry.  The following chart demonstrates this in the LTE context:

| Company | Announced LTE Rates | No. of Essential LTE Patents |
|---|---|---|
| 1. Qualcomm | 3.3% | 350 |
| 2. Huawei | 1.5% | 182 |
| 3. Ericsson | 1.5% | 146 |
| 4. Nokia | 1.5% | 142 |
| 5. Nortel | 1.0% | 46 |
| 6. Siemens | 0.8% | 32 |
| 7. Motorola | 2.3% | 16 |
| 8. Alcatel | 2.0% | 9 |

Source: Stasik, Eric, "Royalty Rates and Licensing Strategies for Essential Patents on LTE (4G) Telecommunication Standards," *les Nouvelles*, September 2010, p. 116.

54.    Qualcomm's rate base is also part of what makes Qualcomm's royalties so abusive.  Qualcomm admits that its "[r]oyalties are generally based upon a ***percentage of the wholesale (i.e., licensee's) selling price of complete licensed products***, net of certain permissible deductions (including transportation, insurance, packing costs and other items)."  (Emphases added.)  Using the entire value of an end product is not a reasonable basis for calculating SEP-based royalties.  Indeed, on or around February 8, 2015, the IEEE and its Standards Association updated their licensing policy, stating that a reasonable royalty should be the value attributable to a SEP, excluding the value of that SEP's inclusion in an IEEE standard, and that a factor to consider when determining the reasonable rate is the value of the relevant functionality of the smallest salable compliant implementation that practices the essential patent claim.  Qualcomm's power and leverage allows it to force licensees to pay

21

excessive rates on an unreasonable rate basis, which results in a royalty divorced from the actual value attributable to its technologies and intellectual property.

55.    Qualcomm realizes the benefits of maintaining its licensing business and chipset business in one company, rejecting a push from an activist investor hedge fund to split the businesses into two companies.  "The strategic benefits of the current structure will best fuel Qualcomm's growth as we move through the upcoming technology transitions and extend our technologies into new user experiences, services and industries," said Qualcomm's CEO, Steve Mollenkopf.[14]

### C. Regulators Investigate and Penalize Qualcomm's Abusive Conduct

56.    While Qualcomm's abusive and unfair licensing practices have allowed it to rake in billions of dollars in undeserved profits, these practices have not gone unnoticed by courts and foreign and domestic regulatory agencies.  In the last few years, Qualcomm's royalty calculations and licensing practices have come under scrutiny by competition regulators of China, South Korea, Taiwan, Japan, Europe, and the United States.  As described below, competition law enforcement authorities around the world have concluded that, or are about to conclude, Qualcomm's conduct as alleged herein is anticompetitive, unfair, and injurious to consumers.

57.    For example, in November 2013, China's NDRC began to investigate Qualcomm's SEP licensing practices.[15]  On February 10, 2015, the NDRC found Qualcomm (1) controlled the SEP Licensing Market and the CDMA, WCDMA, and LTE baseband chip markets, and (2) abused that

---

[14]    Mike Freeman, *Qualcomm rejects breakup plan*, LOS ANGELES TIMES (Dec. 15, 2015) http://www.latimes.com/business/la-fi-qualcomm-20151215-story.html.

[15]    H. Stephen Harris, Jr., *An Overview of the NDRC Decision in the Qualcomm Investigation* (July 2015), CPI ANTITRUST CHRONICLE (July 2015), available at http://www.winston.com/en/thought-leadership/an-overview-of-the-ndrc-decision-in-the-qualcomm-investigation.html.

22

dominance by, among other things, charging excessive and unfairly high royalties to any licensees that were "forced" to accept the packaged patent licenses, the royalty rates of which were based on the wholesale net selling prices of smart phones.  The NDRC found Qualcomm's conduct constituted violations provisions of the China Anti-Monopoly Law and, among other things, imposed a fine of 8% of Qualcomm's annual revenue within the territory of China for 2013 – a $975 million fine.[16]  It also ordered Qualcomm to materially lower the effective royalty by calculating its royalty not based on the total wholesale price of the device, but by calculating its royalty at 65% of the net selling price.[17]

58.    In July 2009, the KFTC fined Qualcomm for abusing its dominant share of the chipset market and the SEP license market.[18]  The $207 million fine was the largest the KFTC had ever imposed on a company.  Undeterred by this fine, Qualcomm doubled down on its unlawful conduct.  In December of 2016, the KFTC issued a decision imposing its largest fine for Qualcomm's monopolistic conduct and mandating changes to Qualcomm's business model.  Among other things, the KFTC found that Qualcomm had coerced patent license agreement from handset companies while holding hostage the supply of chipsets.  In other words, "Qualcomm actually used the threat of terminating the supply of modem chipsets as *negotiation leverage* in the process of license

---

[16]    Qualcomm Press Release, *Qualcomm and China's National Development and Reform Commission Reach Resolution* (Feb. 9, 2015), https://www.qualcomm.com/news/releases/ 2015/02/09/qualcomm-and-chinas-national-development-and-reform-commission-reach.

[17]    *Id.*

[18]    *See* Yoonhee Kim & Hui-Jin Yang, *A Brief Overview of Qualcomm v. Korea Fair Trade Commission*, CPI Antitrust Chronicle (Mar. 2015), https://www.competitionpolicyinternational.com/assets/Uploads/KimYangMar-151.pdf.

negotiations with handset companies." (Emphases in original.)[19]  The KFTC found Qualcomm's control over the chipset market "is a structure under which handset companies have to bite the bullet and accept Qualcomm's license terms, even if they are unfair, because if the modem chipset supply is suspended, handset companies would face the **risk** of their **entire business** shutting down."[20] (Emphases in original.)

59.    Similarly, in December 2015, the Taiwan Fair Trade Commission ("TFTC") notified Qualcomm of its investigation into Qualcomm's licensing behavior and among other things, whether Qualcomm's royalty charges are unreasonable.[21]

60.    Most recently, the FTC on January 17, 2017, filed an enforcement action in this Court seeking a permanent injunction against Qualcomm to undo and prevent its unfair methods of competition in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. §45(a).  The FTC alleges, among other things, that (1) Qualcomm withholds its baseband processors unless a customer accepts a license to standard-essential patents on terms preferred by Qualcomm, including elevated royalties; (2) Qualcomm has consistently refused to license its cellular standard essential patents to its competitors, in violation of Qualcomm's FRAND commitments; and (3) Qualcomm entered into exclusive dealing arrangements with Apple Inc., which denied other baseband processor suppliers the benefits of working with a particularly important cell phone manufacturer and hampered their development into effective competitors.  *Id.*

---

[19]    *See supra* note 5.

[20]    *Id.*

[21]    Additionally, the European Commission ("EC") notified Qualcomm of its investigation in October 2014.  The EC issued a Statement of Objections against Qualcomm in December of 2015, which alleged that Qualcomm's practices harmed chipset competition and innovation.

24

**D. Consumers Are Harmed as a Direct Result of Qualcomm's Conduct**

61.    Qualcomm has abused its monopoly power to force device manufacturers and other licensees to pay excessively high royalties, among other things, which has directly resulted in harm to Plaintiff and the Class because it resulted in them paying higher prices for their cellular devices than they would have in the absence of Qualcomm's conduct.

62.    Cellular devices are commodity products that consumers purchase as standalone products.  Consumers buy cellular devices either from the direct purchaser device manufacturer such as Samsung, or through their network carrier, such as Verizon and Sprint.

63.    Device manufacturers and network carriers are subject to vigorous price competition, and as a result, they do not absorb Qualcomm's unlawful royalties which are a percentage of the wholesale cost of the device itself, and instead pass along some, or all, of the excessive royalty to consumers.  For instance, chipsets, or baseband processers, cost as little as $10 to $13, but royalty demands associated with this component approach $60 for a $400 smartphone.[22]  This disparity between royalty demands and component costs results in an increased cost for the cellular device, which is directly passed on to the consumer.

64.    Ultimately, Qualcomm, Plaintiff, and the Classes (defined below) are all participants in the cellular device market.  Plaintiff and the Classes are consumers of such devices.  Qualcomm licenses technology essential to the operation of cellular devices and obtains monopoly rents tied directly to the entire wholesale price of the cellular devices at issue in this litigation.  As a result, Qualcomm's anticompetitive acts, as alleged herein, directly distorted the

---

[22]    *See supra* note 2; *see also* Nomura 2012 Smartphone Guide http://www.patenttoday.com/wp-content/uploads/2014/08/nomura_smartphone_poster_2012.pdf.

price of the cellular devices paid by Plaintiff.  Indeed, Plaintiff may not use the cellular devices at issue in this litigation without the licenses provided by Qualcomm.  In the absence of the licenses, as recognized by federal courts, Qualcomm has standing to sue any indirect users − not just direct infringers − of cellular devices infringing on its patent rights.

65.    As noted above, Qualcomm admits that "[r]oyalties are generally based upon a ***percentage of the wholesale (i.e., licensee's) selling price of complete licensed products***, net of certain permissible deductions (including transportation, insurance, packing costs and other items)." (Emphases added.)[23] The patent rights owned by Qualcomm are thus inextricably intertwined with the cellular devices themselves − and the effect of the anticompetitive conduct at issue in this case is targeted at the cellular device as a whole and not components thereof, as reflected by the royalty's derivation from the price of the cellular device as a whole.

66.    Plaintiff and members of the Classes have been forced to pay supra-competitive prices for cellular devices.  As Qualcomm licenses base its royalties on "a percentage of the wholesale . . . selling price of a complete licensed product," purchasers of cellular devices are only one level removed from the unlawful overcharge at issue here.  Accordingly, this case will not involve complicated pass-through analysis in multiple and complex distribution chains. *Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1098 (N.D. Cal. 2007).

67.    The economic and legal literature has recognized that unlawful overcharges in a component normally result in such instances.  Two antitrust

---

[23]    Calculating a royalty rate for a product component based on the price of the product as a whole is particularly inappropriate and unfair. *E.g.*, *Laser Dynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) ("[w]here small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product").

scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the HANDBOOK OF THE LAW OF ANTITRUST) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[24]

68.     Similarly, Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Certification), an economist who presented evidence in a number of indirect purchaser cases involving Microsoft Corporation, said:

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers . . . . This general phenomenon of cost pass through is well established in antitrust laws and economics as well.[25]

69.     If Qualcomm was forced to stop abusing its monopoly power and charge a fair and reasonable royalty, consumers would receive better prices when purchasing cellular devices.

70.     The precise amount of the overcharge impacting the prices of cellular devices purchased by consumers is measureable through commonly accepted statistical and regression modeling.

---

[24]     Robert G. Harris and Lawrence A. Sullivan, *Passing On the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 269, 276 (Dec. 1979).

[25]     Order re: Class Certification, at 13-14, *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases*, J.C.C.P. No. 4106 (Cal. Sup. Ct. Aug. 29, 2000).

## V.    MARKET DEFINITION

71.    The relevant geographic market for purposes of this action is the United States and its territories.

72.    The relevant product markets are: (1) the market for CDMA and premium LTE modem chipsets ("Modem Chipset Market"), also known as baseband processors, which allow cellular devices to communicate with carrier networks; and (2) intellectual property rights associated with SEPs ("SEP Licensing Market").  These two products will be referred to collectively as the "Cellular Device Components."

73.    Qualcomm directly participates in the market for the sale of cellular devices to Plaintiff and the Classes by encumbering cellular devices through its licenses (and related excessive royalties).  Specifically, Qualcomm's royalty payments are calculated as a percentage of the wholesale price of the cellular devices, which in turn, increase the retail price of those devices.

74.    Plaintiff purchased the Cellular Device Components when she bought a cellular device.  Plaintiff's injuries are direct and foreseeable results of Qualcomm's anticompetitive conduct with respect to chipset modems and abuse of patent rights because it has increased the cost of buying cellular devices by, among other things: (1) eliminating competition, allowing Qualcomm to charge supracompetitive prices for its chipsets and licenses; and (2) forcing device manufacturers to agree to onerous licensing terms, including excessive royalties.

## VI.    CLASS ACTION ALLEGATIONS

75.    Plaintiff brings this action on behalf of herself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable, injunctive relief and monetary relief under California law on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the

28

purchase price for CDMA- and/or premium LTE cellular devices ("Relevant Cellular Devices") from January 17, 2013 through the present.  This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for those who have purchased Relevant Cellular Devices; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

76.    Alternatively to the claim for nationwide monetary relief under California law, Plaintiff also brings this action on behalf of herself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages or monetary relief  pursuant to the common law of unjust enrichment and individual state antitrust, unfair competition, and consumer protection laws for each of the states listed below (the "Indirect Purchaser States")[26] on behalf of the following class (the "Damages Class"):

All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA-, and/or premium LTE cellular devices ("Relevant Cellular Devices") from January 17, 2013 through the present.   This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for those who have purchased Relevant Cellular Devices; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

---

[26]    The "Indirect Purchaser States" consist of Arizona, Arkansas, California, Colorado, District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

29

77.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

78.    While Plaintiff does not know the exact number of the members of the Classes, Plaintiff believes there are millions of members in each Class.

79.    Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Qualcomm's conduct to acquire and maintain monopoly power, which was and is generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

a.    whether Qualcomm possessed monopoly power over the Cellular Device Components in the United States during the Class Period;

b.    whether Qualcomm willfully acquired or maintained monopoly power over the Cellular Device Components in the United States during the Class Period;

c.    whether Qualcomm possessed monopoly power in the Modem Chipset Market (underlying the Cellular Device Components) in the United States during the Class Period;

d.    whether Qualcomm attempted to possess monopoly power in the modem chipset market (a critical market underlying the Cellular Device Components) in the United States during the Class Period;

e.    whether Qualcomm possessed monopoly power in the SEP Licensing Market (for licenses critical to the technology underlying the Cellular Device Components) in the United States during the Class Period;

f.    whether Qualcomm attempted to possess monopoly power in the SEP Licensing Market (for licenses critical to the technology

underlying the Cellular Device Components) in the United States during the Class Period;

g.      whether Qualcomm tied the sale of its CDMA- and premium LTE- based chipsets to the purchase of license rights to its patent portfolio (including SEPs and non-SEPs);

h.      whether Qualcomm tied the sale of its SEPs with the purchase of its non-SEPs;

i.      whether Qualcomm's acquisition and maintenance of its monopoly in the Cellular Device Components violated the Sherman Act, as alleged in the First Claim for Relief;

j.      whether Qualcomm's acquisition and maintenance of its monopoly in the power in the Modem Chipset Market violated the Sherman Act, as alleged in the First Claim for Relief;

k.      whether Qualcomm's acquisition and maintenance of its monopoly in the SEP Licensing Market (for licenses critical to the technology underlying cellular device market) violated the Sherman Act, as alleged in the First Claim for Relief;

l.      whether Qualcomm's conduct violated California's Cartwright Act, Cal. Bus. & Prof. Code §§16700, *et seq*., as alleged in the Second Claim for Relief;

m.      whether Qualcomm's conduct violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Third and Fourth Claims for relief;

n.      whether Qualcomm unjustly enriched itself to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Qualcomm, as alleged in the Fourth Claim for Relief;

CLASS ACTION COMPLAINT

o.      whether the conduct of the Qualcomm, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

p.      the effect of Qualcomm's unlawful conduct on the prices of Relevant Cellular Devices sold in the United States and its territories during the Class Period;

q.      the appropriate injunctive and related equitable relief for the Nationwide Class; and

r.      the appropriate class-wide measure of damages for the Damages Class.

80.    Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes.  Plaintiff and all members of the Classes are similarly affected by Qualcomm's wrongful conduct in that they paid artificially inflated prices for devices purchased indirectly from Qualcomm.

81.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

82.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

83.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous

individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

84.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

## VII.    CLAIMS AND PRAYER FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Monopolization in Violation of Section 2 of the Sherman Act**

85.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

86.    Qualcomm's conduct, as alleged herein, constitutes unlawful monopolization of the market for Cellular Device Components, in violation of Section 2 of the Sherman Act (15 U.S.C. §2).

87.    General antitrust principles apply to conduct involving intellectual property in the same way that they apply to conduct involving any other form of property.

88.    Market power is the ability profitably to maintain prices above, or output below, competitive levels for a significant period of time.  Monopoly power is the ability to control prices and exclude competition in a given market. If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power.

89.    Qualcomm has monopoly power in the Modem Chipset Market. First, it has maintained high and durable market shares in this market. Qualcomm controls the CDMA chipset supply, historically controlling over 90% of the CDMA modem chipset market and at the lowest point still controlling

83% of this market.  Qualcomm also controls the Modem Chipset Market, controlling at relevant times up to 90% of the market, and today over 60% of the market.  Qualcomm still exclusively supplies multimode CDMA-LTE chipsets that are backward compatible with CDMA.  Second, there are substantial barriers to entry.  CDMA- and premium LTE- based technology is not interchangeable with or substitutable for other technologies, and adherents of this technology have become locked-in.  Relatedly, Qualcomm controls the patents or SEPs underlying CDMA technology, and Qualcomm maintained this monopoly by, among other things, refusing to license to competitors and requiring purchasers of its chipsets to agree to its licenses for its patent portfolio. Third, and relatedly, Qualcomm's monopoly power is shown by Qualcomm's demonstrated ability to repeatedly force device manufacturers to accept one-sided, unreasonable supply terms.  Among other things, Qualcomm has used its control over the CDMA chipset supply to require purchasers to agree to its license agreements and related terms, including excessively high royalties terms on an equal footing.

90.     Qualcomm also has monopoly power over the SEP Licensing Market.  SSOs have selected standards based on technology for which Qualcomm owns the patents (based on the condition that Qualcomm would supply its technology on FRAND terms).  As to market share, Qualcomm holds virtually all of the SEPS − the essential patents − for CDMA standard-based technologies, which underlie virtually all 3G devices and 4G-LTE devices which are 3G-compatible.  Qualcomm has licensed its patent portfolio for 3G cellular devices to more than 200 licensees.  As these patents are "essential" to the CDMA standard, other patents and patented technology cannot replace or serve as an alternative for Qualcomm's patents.  Qualcomm's market power over the SEP Licensing Market is further demonstrated by Qualcomm's ability to leverage its control of its patents to force OEMs to agree to unfair and

34

unreasonable license agreements and terms, including excessive royalties. Because OEMs need to use Qualcomm's technology for their devices to communicate with the major carrier networks, they are forced to agree to Qualcomm's unfair and unreasonable licensing terms.

91.     As indicated above, Qualcomm has acquired and maintained its market power in the Cellular Device Components through anticompetitive means – among other things, excluding competitors and forcing OEMs to agree to non-FRAND terms.

92.     Qualcomm holds market power over the Cellular Device Components because it can encumber Relevant Cellular Devices with a royalty of its choice without other firms competing to drive down these prices. Specifically, Qualcomm's control over the Cellular Device Components has allowed it to force license agreements on its competitors and OEMs, and its license agreements allow Qualcomm to charge a licensing fee plus ongoing royalties of between three to five percent (3%-5%) of the wholesale price of the completed device. In other words, each Relevant Cellular Device sold with or based on Qualcomm technology is also encumbered by Qualcomm's excessive royalties, which in turn, increase the cost of the device for consumers like Plaintiff.

93.     There is no procompetitive justification for the anticompetitive conduct in which Qualcomm has engaged. Qualcomm induced SSOs to use its technology and related patents in setting their standards on the promise that it would adhere to FRAND obligations. In doing so, other alternative (and potentially superior) technologies were not utilized by SSOs. But Qualcomm has not met its FRAND obligations, and instead, has abused its monopoly power in the Cellular Device Components to force OEMs into licenses with unfair and unreasonable terms, including, but not limited to, excessively high royalty rates based on the selling price of the completed device rather than the value of

35

Qualcomm's contribution to that device. Qualcomm's acts have likely harmed the development of cellular technologies, as it forced out competitors, thus reducing innovation and competitive pricing.

94.    Plaintiff and the Classes were harmed as a direct result of Qualcomm's conduct, which increased the purchase price of their relevant cellular devices. Additionally, Qualcomm's conduct harmed innovation and competition, which harmed Plaintiff in the quality and price of her relevant cellular devices.

## SECOND CLAIM FOR RELIEF

### Claim for Violation of the Cartwright Act,
### Cal. Bus. & Prof. Code §§16700, *et seq.*

95.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

96.    During the Class Period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of Calif. Bus. & Prof. Code §§16700, *et seq.* While §16700 does not reach solely unilateral conduct by a monopolist, it encompasses agreements between a monopolist and its customers where the monopolist effectively coerces the customer to accede to the restraint in order to obtain the good or service that is the subject of the agreement. That is what happened here. Despite its FRAND obligations, Qualcomm unilaterally imposed royalty rates that were unreasonable and exceeded what it could have obtained in a true FRAND negotiation. This conduct constitutes a "combination" under the Cartwright Act.

97.    Qualcomm established an unlawful scheme by which it acquired and maintained monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive means, including by excluding competition.

98.    The Relevant Cellular Devices are commodities.

99.    As a direct result of Qualcomm's unlawful conduct, Plaintiff and the Classes were overcharged when they purchased their Relevant Cellular Devices.

100.    It is appropriate to apply California antitrust law to the Nationwide Class.  Qualcomm is headquartered in California, and Qualcomm subjected its competitors as well as OEMs that reside and do business in California to its unlawful conduct.  In doing so, Qualcomm reaped a significant portion of its profits as a result of its unlawful scheme from companies doing business in California.  Additionally, California is the most populous state in the country, for which it was foreseeable that a substantial number of California consumers would be impacted by Qualcomm's unlawful behavior

### THIRD CLAIM FOR RELIEF

**Claim for Violations of Unfair Competition Law,
Cal. Bus. & Prof. Code §§17200, *et seq*.**

101.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

102.    Qualcomm's conduct constitutes a violation of California's Unfair Competition Law, Calif. Bus. & Prof. Code §§17200, *et seq*., which protects consumers from illegal, fraudulent, and unfair business practices.

103.    Plaintiff brings this claim on behalf of herself, the Damages Class, and on behalf of the public as private attorneys general pursuant to Cal. Bus. & Prof. Code §17204.

104.    As discussed above, Qualcomm's conduct constitutes violations of the Sherman Act and the Cartwright Act.  As such, Qualcomm's acts constitute unlawful conduct under §17200.  Qualcomm unlawfully acquired and maintained its monopoly over the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in

exclusive dealing arrangements with its customers to keep out competitors, and forcing OEMs to license its patent portfolio.

105.   Qualcomm's conduct was deceptive because it induced SSOs to use its technology on the promise it would comply with FRAND.  But after SSOs selected Qualcomm's technology for their standards, Qualcomm refused to comply with its FRAND promises.

106.   Qualcomm's conduct is unfair to Plaintiff and members of the Damages Class because, as a direct result of its acts described above, Plaintiff was charged more for her Relevant Cellular Device than she would have been but for Qualcomm's conduct.

107.   Plaintiff and the Damages Class seek, and are entitled to, all forms of relief available under California's Unfair Competition Law.  Pursuant to Cal. Bus. & Prof. Code §17203, Plaintiff and the Damages Class seek from Qualcomm restitution and the disgorgement of all earnings, profits, compensation, benefits and other ill-gotten gains obtained by Qualcomm as a result of its conduct in violation of Business & Professions Code §§17200 *et seq.*

108.   It is appropriate to apply California antitrust law to the Nationwide Class.  Qualcomm is headquartered in California, and Qualcomm subjected its competitors, as well as handset companies that reside in California, to its unlawful conduct.  In doing so, Qualcomm reaped a significant portion of its profits as a result of its unlawful scheme from companies doing business in California.  Additionally, California is the most populous state in the country, for which it was foreseeable that a substantial number of California consumers would be impacted by Qualcomm's unlawful behavior.

109.   Pursuant to Business & Professions Code §17204, Plaintiff and the Damages Class seek an order of this Court enjoining Qualcomm from continuing to engage in the acts as set forth in this Complaint, which acts

CLASS ACTION COMPLAINT

constitute violations of Business & Professions Code §17200 *et seq.* Plaintiff, the Class, and the public will be irreparably harmed if such an order is not granted.

### FOURTH CLAIM FOR RELIEF

### Unjust Enrichment (California Law)

110. Plaintiff repeats the allegations set forth above as if fully set forth herein.

111. As a result of its unlawful conduct described above, Defendant Qualcomm has and will continue to be unjustly enriched. Defendant has been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits related to the Relevant Cellular Devices.

112. Defendant has benefited from its unlawful acts and it would be inequitable for it to be permitted to retain any of the ill-gotten gains resulting from its unlawful practices and the overpayments made by Plaintiffs and members of the Damages Class for Relevant Cellular Devices during the Class Period.

113. Plaintiff and members of the Damages Class are entitled to the amount of Defendant's ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct. Plaintiff and members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a *pro rata* basis.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment that:

A. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule

23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.    That the unlawful conduct alleged herein constituted a violation of Section 2 of the Sherman Act, and the California antitrust and consumer protection laws set forth herein;

C.    Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed under such state antitrust and consumer protection laws, and that a joint and several judgment in favor of Plaintiff and members of the Damages Class be entered against Defendant in an amount to be trebled to the extent such laws permit;

D.    Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.    Defendant, is affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct alleged herein, or from committing any other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.    Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits from Defendant obtained as a result of its acts of unfair competition and acts of unjust enrichment;

G.    Plaintiff and members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.    Plaintiff and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

CLASS ACTION COMPLAINT

1    I.    Plaintiff and members of the Classes have such other and further

2  relief as the case may require and the Court may deem just and proper.

3                                **JURY DEMAND**

4    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal

5  Rules of Civil Procedure, of all issues so triable.

6
7  Dated: January 25, 2017                SCOTT+SCOTT, ATTORNEYS AT
                                          LAW, LLP
8

9                                          s/ Christopher M. Burke
                                          _____
10                                        CHRISTOPHER M. BURKE
                                          Walter W. Noss
11                                        Hal D. Cunningham
                                          John T. Jasnoch
12                                        Jennifer J. Scott
                                          Kate Lv
13                                        707 Broadway, Suite 1000
                                          San Diego, CA 92101
14                                        Telephone: 619-233-4565
15
16                                        *Attorneys for Plaintiff*
17
18
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT